UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN THE MATTER OF THE TAX
LIABILITIES OF:

| | |
|---|---|
| JOHN DOES, United States person(s), who directly or indirectly had authority over any combination of accounts held with Circle Internet Financial, Inc. or its predecessors, subsidiaries, divisions, or affiliates, including Poloniex LLC (collectively, "Circle") with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016 through December 31, 2020. | ) ) ) Case No. _____ ) ) DECLARATION OF SENIOR ) REVENUE AGENT JOHN MARK ) PEIL IN SUPPORT OF EX PARTE ) PETITION TO SERVE JOHN DOE ) SUMMONS ) ) ) ) ) |

<u>DECLARATION OF JOHN MARK PEIL</u>

I, John Mark Peil, pursuant to 28 U.S.C. § 1746, declare and state:

1.        I am a duly commissioned Internal Revenue Agent ("Revenue Agent")

assigned as a Senior Revenue Agent in the Internal Revenue Service's ("IRS" or

"Service") Offshore Compliance Initiatives ("OCI").  OCI develops projects,

methodologies, and techniques for identifying United States ("U.S.") taxpayers who are

involved in abusive offshore transactions and financial arrangements for tax-avoidance

purposes.  Although OCI's work typically involves abusive offshore transactions and

financial arrangements, the virtual currency issues I have been working on are not

limited to offshore activities.

2.        I have been a Revenue Agent since 2006 and have served in OCI since

September 2013.  Prior to September 2013, I served as a Revenue Agent in the Small

Business/Self-Employed Division and the Large Business and International Division of

the IRS.  I have been assigned to the Virtual Currency Campaign since July 2018.  My post of duty is in Farmers Branch, Texas.

## I.    Background

3.    The IRS is conducting an investigation to determine the identity and correct federal income tax liability of U.S. persons who conducted transactions in cryptocurrency for the years ended December 31, 2016, 2017, 2018, 2019, and 2020.

4.    As the organization responsible for enforcing and administering the internal revenue laws of the United States, the IRS, in recent years, has become aware of significant tax compliance issues relating to the use of virtual currencies, including cryptocurrencies, as detailed below.

### A.    Tax Compliance Concerns Associated With the Use of Virtual Currencies and the Service's Compliance Initiative

5.    In 2013, at the request of the Senate Finance Committee, the Government Accountability Office ("GAO") completed a study of the use of virtual currency. Through interviews with industry representatives, tax professionals, IRS officials and academics, GAO identified several tax compliance risks associated with virtual currencies, ranging from lack of knowledge of tax requirements and uncertainty over how to report virtual currency transactions, to deliberate underreporting of income and tax evasion. *See* U.S. Gov't Accountability Office, GAO-13-516, Virtual Economies and Currencies: Additional IRS Guidance Could Reduce Tax Compliance Risks (2013), https://www.gao.gov/products/GAO-13-516 [https://perma.cc/H83E-BFSD].

6.    In September 2016, the Treasury Inspector General for Tax Administration ("TIGTA") issued a report explaining that taxpayer use of virtual currencies, including cryptocurrencies, had expanded significantly in recent years.  *See* As the Use of Virtual

Currencies in Taxable Transactions Becomes More Common, Additional Actions Are
Needed to Ensure Taxpayer Compliance, Reference Number 2016-30-083 (Sept. 21,
2016),  https://www.treasury.gov/tigta/auditreports/2016reports/201630083fr.pdf
[https://perma.cc/5BW9-YXWT]. The report reflects TIGTA's independent determination
that while there are legitimate reasons to use virtual currency -- lower transaction fees
and faster transfers of funds compared to traditional currencies -- some virtual
currencies are also popular because the identity of the parties involved is generally
anonymous, leading to a greater possibility of their use in illegal transactions.

7.     Since 2005, the Service's Electronic Payment Systems Initiative ("EPSI")
has focused on developing projects, methodologies, and techniques for identifying U.S.
taxpayers who use electronic funds transfer and payment systems for tax avoidance
purposes.  In September 2013, OCI expanded the scope of the EPSI to address U.S.
taxpayers who use virtual currencies for tax avoidance purposes, recognizing that some
U.S. taxpayers use such currencies to expatriate and repatriate funds to and from
offshore accounts.

8.     In furtherance of the EPSI, the IRS is conducting an investigation to
identify tax noncompliance related to the use of virtual currency, including
cryptocurrency.  In December 2013, the IRS established a Virtual Currency Issue Team
("VCIT").  The VCIT was established to study the issue and then consider the
compliance impact related to virtual currencies. The VCIT developed a three-pronged
approach involving first learning about virtual currency, next educating the examination
workforce regarding the issue, and then developing examination techniques to identify
and address issues during an examination.  This "John Doe" summons is one of the

tools being used in the investigation.

9.      In June 2015, TIGTA contacted the IRS to gather information for a review of the IRS's compliance strategy for addressing the reporting of revenue and expenses occurring through the use of virtual currencies and other alternative payment methods. At that time, the IRS shared information with TIGTA regarding the VCIT and EPSI.  In October 2015, TIGTA sent the IRS an engagement letter formally initiating its review.  In December 2015, the IRS advised TIGTA that it was working to further its virtual currency investigation.

10.      On November 30, 2016, the District Court for the Northern District of California authorized the IRS to issue a John Doe summons to Coinbase, Inc., a U.S.-based cryptocurrency exchange, to identify U.S. taxpayers who, at any time during the period from January 1, 2013 through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21.  *See United States v. John Doe*, No. 3:16-cv-06658-JSC (N.D. Cal. Nov. 30, 2016) (Order (Doc. 7)). Coinbase was served with the summons on December 8, 2016.  Coinbase did not comply voluntarily with the summons.

11.      On March 16, 2017, a petition to enforce the John Doe summons was filed against Coinbase in the District Court for the Northern District of California.  On November 29, 2017, the court granted the petition to enforce the John Doe summons as narrowed during the course of the enforcement litigation.  *See United States v. Coinbase, Inc.*, No. 17-cv-01431-JSC (N.D. Cal. Nov. 29, 2017) (Judgment (Doc. 77)). Coinbase was ordered to produce documents for accounts with at least the equivalent of $20,000 in any one transaction type (buy, sell, send, or receive) in any one year for

the 2013 through 2015 tax years.

12.     Coinbase advised impacted account holders that it was required to disclose the information described in the enforcement order.  Coinbase's webpage states that, "On February 23rd, 2018, Coinbase notified a group of approximately 13,000 customers concerning a summons from the IRS regarding their Coinbase accounts." https://help.coinbase.com/en/coinbase/taxes-reports-and-financial-services/taxes/irs-notification [https://perma.cc/GL68-BSLM].

13.     On July 2, 2018, the IRS announced its Virtual Currency Compliance campaign directed at addressing "noncompliance related to the use of virtual currency through multiple treatment streams including outreach and examinations."  *See* IRS Announces the Identification and Selection of Five Large Business and International Compliance Campaigns, *available at* https://www.irs.gov/businesses/irs-announces-the-identification-and-selection-of-five-large-business-and-international-compliance-campaigns, [https://perma.cc/KU4F-VKMQ].

14.     Then, on July 26, 2019, the IRS announced that it began sending letters to virtual currency owners, advising them to pay back taxes and file amended returns.  By the end of August 2019, the IRS had issued more than 10,000 letters to taxpayers who owned virtual currency.  Following the issuance of the letters, additional taxpayers filed amended returns reporting virtual currency transactions that were not previously reported.

**B.     Cryptocurrency in General**

15.     Cryptocurrency is a particular type of virtual currency as the IRS has used that term in Notice 2014-21.  Cryptocurrency, however, can be further divided into two

general categories—crypto-coins and crypto-tokens—although the two are often referred to generally as cryptocurrency.

16.    As of January 15, 2021, cryptocurrency tracking website www.coinmarketcap.com indicated that more than 8,000 separate cryptocurrencies existed.  The most widely known cryptocurrency, and largest by capitalization, is bitcoin.  Given bitcoin's prominence in the cryptocurrency ecosystem, other cryptocurrencies are often generically referred to as alternative coins or "altcoins" for short.  A few examples of altcoins are ethereum (ether or ETH), Litecoin (LTC), XRP (ripple or XRP), and stellar (XLM).

17.    In general, cryptocurrency is based on distributed ledger (blockchain[1]) technology.[2]  In a distributed ledger technology system, a user creates a cryptocurrency wallet to engage in cryptocurrency transactions.  A wallet is a computer file that contains information (software and protocols) used in transferring units of a cryptocurrency.  When the wallet is downloaded or purchased (as in the case of a hardware wallet), the user prompts software in the wallet to generate a private key.  The private key is then used to generate a public key, which, in turn, is used to generate an address.  The private key, public key, and address are linked, but the particular

---

[1] While distributed ledger technology is commonly referred to as a "blockchain" this is not entirely accurate.  There are some types of distributed ledgers that do not use "blocks".  *See, e.g.*, *https://www.iota.org/get-started/what-is-iota* [https://perma.cc/PN63-XNKZ] (discussing IOTA distributed ledger's use of a "tangle" chain rather than conventional "block" chain).

[2] *See* Financial Action Task Force Report, *Virtual Currencies Key Definitions and Potential AML/CFT Risks,* June 2014, http://www.fatf-gafi.org/publications/methodsandtrends/documents/virtual-currency-definitions-aml-cft-risk.html [https://perma.cc/3W7X-R6TD]; *see also generally* Bitcoin, https://en.bitcoin.it/wiki/Main_Page [https://perma.cc/DZ44-XBZV].

encryption protocols employed to create the public key and address are only one-way, which prevents the reverse engineering of the private key from the address or public key.[3]

18.     A wallet may hold any number of private/public key pairs.  Addresses and public keys are shared with other users in order to conduct cryptocurrency transactions. Private keys, which are used as the last piece in forming the digital signature to conduct a transaction, generally should not be shared.  Sharing of a private key would permit another individual to engage in transactions on the original user's behalf.[4]

19.     The method described above for transacting in cryptocurrency is generally the same regardless of whether it is a crypto-coin or crypto-token.  There is a difference, however, in how those two assets are created and how transactions for each are validated and tracked.

20.     Crypto-coins are created as a component of the distributed ledger itself. As such, crypto-coin transactions are confirmed by computer nodes participating in the maintenance of the distributed ledger and those transactions are then recorded in blocks that make up the distributed ledger's blockchain (assuming the crypto-coin uses a blockchain-type distributed ledger).

21.     Generally, all transactions on a crypto-coin blockchain can be viewed by the public on any computer connected to the Internet.[5]  However, the blockchain

---

[3] *See* https://www.mycryptopedia.com/public-key-private-key-explained/ [https://perma.cc/QQE2-PG6F]; *see also* David W. Perkins, Cong. Research Serv., IF10824, *Financial Innovation: "Cryptocurrencies,"* (February 2018) https://crsreports.congress.gov/product/pdf/IF/IF10824 [https://perma.cc/6JAD-VSM7].
[4] *See* https://support.coinbase.com/customer/en/portal/articles/2275614-is-a-wallet-address-safe-to-display-publicly-?b_id=13521[https://perma.cc/N8E7-5NFU].
[5] Not all crypto-coins operate this way.  Some are designed specifically to protect all

transactional history generally only reveals the date, time, units, address, wallet ID (to which the address belongs to), and transaction ID associated with a transaction.  The blockchain does not identify the actual identities of the address and wallet owners.

22.     Separately, crypto-tokens are not an inherent part of a distributed ledger. Tokens, rather, are created through particular computer scripts or programs such as smart contracts or decentralized applications (DApps) that are hosted or built off of a distributed ledger.  For example, the Ethereum blockchain is a distributed ledger platform that uses the crypto-coin ether.  *See generally* https://ethereum.org/learn/ [https://perma.cc/MN7S-9ZW8].  The Ethereum blockchain, however, is also designed to host crypto-tokens created through smart contracts or DApps built off of the Ethereum blockchain.  *Id.*  The crypto-coin ether is designed to function as the "gas" (compensation) for running the smart contracts and DApps on the Ethereum platform. *Id.*

23.     As with crypto-coins, crypto-tokens can be transferred using a cryptocurrency wallet.

24.     The peer-to-peer nature of cryptocurrencies, compounded by the pseudo-anonymous nature of publicly-available-transactional information, makes the examination of an individual's cryptocurrency transactions for tax purposes— particularly, the receipt of income or investment gains—more difficult than examinations involving traditional transactions conducted through regular banking or financial institutions.

---

transactional information or at least to provide users the option to do so.  *See e.g.*, https://web.getmonero.org/get-started/what-is-monero/ [https://perma.cc/46KZ-NDJ4]; https://docs.dash.org/en/stable/introduction/features.html#privatesend [https://perma.cc/T6X7-5GH4].

25.      In order to buy cryptocurrency (coins or tokens), a user must transfer traditional (fiat) currency to someone who already has cryptocurrency and wishes to exchange it for traditional currency.  This exchange can occur directly with anyone holding cryptocurrency, but also can be handled through businesses known as digital currency exchanges.  Such businesses (like Circle discussed below), trade between cryptocurrencies and traditional currencies or sometimes just between different cryptocurrencies (coins and tokens).

26.      A digital currency exchange functions much like a traditional currency exchange, except it deals with the conversion of cryptocurrency for traditional currency or vice versa, as well as the exchange of one cryptocurrency for another cryptocurrency.  Digital currency exchanges may also provide wallet services.  These hosted wallet services allow a user to quickly authorize cryptocurrency transactions with another user through the use of a user account held at the exchange.  Hosted wallet accounts are accessible through a computer or mobile device like a smartphone.[6]

27.      Digital currency exchanges are generally regulated as "money transmitters" under Title 31 of the United States Code ("U.S.C.").  *See generally* FinCEN Guidance No. FIN-2013-G001: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013), *available at* https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf [https://perma.cc/E9C8-YH3C]; FinCEN Guidance No. FIN-2019-G001: Application of

---

[6] *See* Edward V. Murphy, M. Maureen Murphy, Michael V. Seitzinger, Cong. Research Serv., R43339, *Bitcoin: Questions, Answers, and Analysis of Legal Issues* (October 2015), https://crsreports.congress.gov/product/pdf/R/R43339 [https://perma.cc/V5QH-VFWW].

FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies (May 9, 2019), *available at* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf [https://perma.cc/6BVK-AJVP].

28.     As a money transmitter, digital currency exchanges are required to obtain and maintain certain customer identification information and transactional data for the purpose of combating illicit activity such as money laundering, tax evasion, and terrorism financing.  *See* 31 U.S.C. § 5311; 31 C.F.R. § 1010.100(ff)(5), § 1022.210; FinCEN Guidance No. FIN-2019-A003: Advisory on Illicit Activity Involving Convertible Virtual Currency (May 9, 2019), *available at:*

https://www.fincen.gov/sites/default/files/advisory/2019-05-10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf [https://perma.cc/3MCL-5YQ9].

29.     With respect to cryptocurrencies, digital currency exchanges, such as Circle, discussed below, provide valuable information about an individual customer's cryptocurrency transactions that can be used in conjunction with other publicly-available blockchain information to adequately examine whether an individual has complied with internal revenue laws.

30.     As detailed below, the Service is pursuing this John Doe summons to Circle in order to obtain customer and transactional information belonging to members of the John Doe class that can be used to conduct examinations of persons that may not have complied with the internal revenue laws.

C.     **Taxation of Virtual Currency**

31.     Virtual currency, including cryptocurrency, is treated as property for tax purposes.  *See generally* Notice 2014-21.  The following examples provide an overview of how tax principles applicable to transactions in property apply to transactions in virtual currency:

- Wage, salary, or other income paid to an employee with virtual currency is reportable by the employee as ordinary income and subject to employment taxes paid by the employer.
- Virtual currency received by a self-employed individual in exchange for goods or services is reportable as ordinary income and is subject to self-employment tax.  This would include a person who "mines" virtual currency as a trade or business.
- Virtual currency received in exchange for goods or services by a business is reportable as ordinary income.
- Gain on the exchange of virtual currency for other property is generally reportable as a capital gain if the virtual currency was held as a capital asset and as ordinary income if it is property held for sale to customers in a trade or business.
- Gain on the sale of property held as a capital asset in exchange for virtual currency is reportable as a capital gain.
- Payments made in virtual currency are subject to information reporting requirements to the same extent as payments made in real currency or instruments denominated in real currency.

32.     Users of digital currency exchanges such as Circle may engage in taxable transactions through the receipt of cryptocurrency into the person's digital currency exchange account as payment for goods or services, or through the buying and selling

of cryptocurrency through the person's digital currency exchange account.

**D.    The Service's Experience with Tax Non-Compliance Involving Virtual Currency**

33.    As noted above, both GAO and TIGTA have raised concerns about tax compliance issues relating to virtual currency.  And, as discussed above, the Service has initiated specific programs and campaigns to address compliance issues through both taxpayer education and enforcement.

34.    Some taxpayers may deliberately use virtual currencies to evade taxes. Certain taxpayers have openly acknowledged their plans to violate internal revenue laws by intentionally not reporting income from the use of virtual currency.  See *36% of Bitcoin Investors Plan to Commit Tax Fraud This Year*, The Motley Fool (January 7, 2018) https://www.fool.com/taxes/2018/01/07/36-of-bitcoin-investors-plan-to-commit-tax-fraud-t.aspx [https://perma.cc/4K92-R3XJ] (referencing a cryptocurrency user poll conducted by www.lendedu.com, https://www.lendedu.com/blog/investing-in-bitcoin [https://perma.cc/4QWZ-AUNM]).

35.    Since transactions can be difficult to trace and many virtual currencies inherently have a pseudo-anonymous aspect, taxpayers may use them to hide taxable income. This is illustrated by the actions of the taxpayers described in Part II.C., below. Each of the taxpayers described in Part II.C. held assets and conducted transactions through Circle, which were not reported on federal income tax returns.

36.    My research also identified individuals (married Taxpayers 5 and 6) who were prosecuted and convicted of money laundering and other federal crimes, and who used a Circle account to hold and convert their profits from illegal activities, as discussed in Part II.C., below.

37.    In the experience of the IRS, tax noncompliance increases when there is no third-party information reporting.  Taxpayers are less likely to report and pay taxes on income that is not independently reported to the IRS by a third party. IRS "tax gap" studies consistently show that tax compliance is far higher when reported income amounts are subject to information reporting by third parties. The most recent such study, published on September 26, 2019 based on 2011-2013 data, concluded that the overall rate of underreporting of income that was not subject to third-party information reporting was 55 percent, compared to 5 percent for amounts subject to substantial information reporting but no withholding, and 1 percent for amounts subject to substantial information reporting and withholding. *See* IRS Publication 1415,Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2011-2013, (September 2019), available at https://www.irs.gov/pub/irs-pdf/p1415.pdf [https://perma.cc/2XM5-PDNH].  Where there is no third-party information reporting of virtual currency transactions for tax purposes, as is the case with Circle, the likelihood of underreporting is significant.

38.    During the Service's summons enforcement litigation against Coinbase, the IRS determined that for 2013-2015 only 800 to 900 taxpayers per year filed tax returns with a property description related to bitcoin or virtual currency despite the fact that Coinbase alone had serviced more than 5.9 million customers and handled more than $6 billion in transactions during that time.  *United States v. Coinbase, Inc., et al.*, 120 A.F.T.R.2d 2017-6671, 2017 WL 5890052, *4 (N.D. Cal. Nov. 28, 2017).

39.    The IRS has recently determined that post-Coinbase the number of taxpayers filing tax returns with a property description related to bitcoin or virtual

currency has increased.  Running the same search ran in the Coinbase litigation, the IRS found that 3,926 taxpayers in 2016, 82,518 for 2017, and 88,976 in 2018 filed a return reporting bitcoin or virtual currency.  While these numbers reflect a positive increase in reporting, these numbers still fall far short of what would be expected given the number of users, transactions, and value that the virtual currency exchanges publicize occur on an annual basis.

40.     Since Coinbase complied with the John Doe summons, the IRS has continued to reach out to taxpayers regarding their reporting requirements, conduct examinations and make criminal investigation referrals.  These compliance efforts are ongoing and will remain a priority.  The IRS has also received submissions through its voluntary disclosure practice reporting additional taxes or changes in tax attributes relating to failures to report income from virtual currency transactions.  Since issuing more than 10,000 Virtual Currency Compliance campaign letters to taxpayers in July 2019, the IRS has received amended returns reporting virtual currency transactions for tax years 2013 through 2018.  As a result of the letters, the IRS has made more than $13.1 million in assessments to date.  These assessments are the result of taxpayers filing amended returns that contain previously unreported virtual currency transactions. Separately, the IRS has contacted taxpayers who have not filed returns reporting virtual currency by sending notices related to virtual currency.  Those notices have already resulted in more than $11.9 million in assessments.  The IRS anticipates assessments will increase as it continues to pursue civil and criminal investigations.

41.     More recently based on internal and external data available to the IRS, letters were sent to taxpayers who conducted transactions with foreign virtual currency

exchanges and may have failed to properly report such transactions and associated income.

42.     As detailed below in paragraphs 67 to 72, and supported by further information available to the IRS and my experience as a Senior Revenue Agent, the IRS has a reasonable basis for believing there are U.S. taxpayers with accounts at Circle who are not in compliance with U.S. income tax reporting requirements because they are not correctly reporting certain items or are simply failing to report any income or tax relating to virtual currency transactions.

## II.    Circle

### A.    Organizational Structure

43.     Circle Internet Financial Limited, organized under the laws of Ireland, is the parent company of multiple subsidiaries, including Circle Internet Financial, Inc. and Circle Trade Europe Limited.

44.     Circle Internet Financial, Inc. was incorporated under the laws of Delaware on August 12, 2013.

45.     Circle Trade Europe Limited was incorporated under the laws of the United Kingdom on March 16, 2018.

46.     Circle was founded in 2013 by Jeremy Allaire and Sean Neville.  Allaire currently serves as the Chief Executive Officer of Circle.  *See* Crunchbase, https://www.crunchbase.com/organization/circle-2 [https://perma.cc/9ALP-4Q3Z] and https://www.linkedin.com/company/circle-internet-financial (copy attached as **Exhibit 1**).

47.      As of October 2019, subsidiaries of Circle Internet Financial Limited included, but were not limited to: Pluto Holdings Inc.; Poloniex, LLC; SeedInvest, LLC;

SI Securities, LLC dba SeedInvest; SeedInvest Technology, LLC; and SI Portal, LLC. Circle Internet Financial Limited and its subsidiaries collectively operate as the Circle group of affiliated companies.  *See* In re: Poloniex, LLC, Stipulation and Consent Order https://dfr.vermont.gov/reg-bul-ord/re-poloniex-llc-stipulation-and-consent-order (copy attached as **Exhibit 2)**; BrokerCheck by FINRA, SI Securities, LLC, https://brokercheck.finra.org/firm/summary/170937 [https://perma.cc/BRH4-EN56]; *Circle Closes Acquisiton of SeedInvest, Another Step Towards the Democratization of Finance*, https://www.circle.com/blog/circle-closes-acquisition-of-seedinvest-another-step-towards-the-democratization-of-finance [https://perma.cc/8Y5E-76UN]. The John Doe summons only seeks records with respect to Circle group customer accounts through which taxpayers engaged in cryptocurrency transactions and records to identify such Circle group customers and the persons with whom these customers transacted.

48.    Circle describes itself as "a new kind of global financial services company. A platform for individuals, institutions and entrepreneurs to use, trade, invest and raise capital with open crypto technologies." https://web.archive.org/web/20191022123009/https://www.circle.com/en/.

49.    In October 2013, Circle launched operations serving only invited customers. In September 2014, Circle opened its services to the public.  *See Circle Opens Doors to Global Audience* (Sept. 29, 2014), https://www.circle.com/blog/circle-opens-doors-to-global-audience [https://perma.cc/2PG6-FTPY]. Initially, Circle provided consumer finance products designed to allow customers to store and use digital money anywhere in the world.  *See What We Have Been Up to at Circle* (May 16, 2014), https://www.circle.com/blog/what-we-have-been-up-to-at-circle [https://perma.cc/8KXM-

4GRG]. However, Circle has expanded its product line through acquisitions, including

Trigger Finance, Inc. (2017), Poloniex, Inc. (2018) and SeedInvest, LLC (2019).  *See*

*Circle Acquires Trigger and Opens New York Office* (Oct. 16, 2017),

https://www.circle.com/blog/circle-acquires-trigger-and-opens-new-york-office

[https://perma.cc/EKH6-8UB9]; *Circle Acquires Poloniex* (Feb. 26, 2018),

https://www.circle.com/blog/circle-acquires-poloniex [https://perma.cc/P54D-TP32];

*Circle Closes Acquisiton of SeedInvest, Another Step Towards the Democratization of*

*Finance*, https://www.circle.com/blog/circle-closes-acquisition-of-seedinvest-another-

step-towards-the-democratization-of-finance [https://perma.cc/8Y5E-76UN].

50.     Circle is headquartered in Boston, Massachusetts, with additional offices

in New York, San Francisco, Dublin, London, and Hong Kong.  *See*

https://www.linkedin.com/company/circle-internet-financial (copy attached as **Exhibit 1**);

*Circle's New Capital, China and Euro Expansion*, https://www.circle.com/blog/circles-

new-capital-china-and-euro-expansion [https://perma.cc/B6KS-9A9Q].  As of July 3,

2019,[7] Circle had served more than 8 million customers and 1,000 institutions with over

$200 billion in trading volume of more than 60 assets.  *See*

https://web.archive.org/web/20191022123009/https:/www.circle.com/en/.

51.     Circle Internet Financial, Inc. and Poloniex, LLC have had active

registrations with the United States Financial Crimes Enforcement Network as money

service businesses ("MSBs").  Circle Internet Financial registered as of February 19,

2019.  *See* https://www.fincen.gov/msb-registrant-search [https://perma.cc/VRC8-

_____

[7] As discussed in paragraph 59, below, in November 2019, Circle spun Poloniex into a
separate entity and closed Poloniex's services to U.S. investors.  The figures in this
paragraph apply to the period before the spin off of Poloniex.

8UUC].  Poloniex, LLC registered as of May 28, 2019.  *See id.*  A MSB is required by the Bank Secrecy Act (Title 31, U.S. Code) to conduct basic customer risk assessments to determine the level of risk associated with the account and whether further due diligence is necessary.  *See* 31 U.S.C. § 5311; 31 C.F.R § 1010.100(ff)(5), § 1022.210; FinCEN Guidance No. FIN-2019-A003: Advisory on Illicit Activity Involving Convertible Virtual Currency (May 9, 2019), *available at:*

https://www.fincen.gov/sites/default/files/advisory/2019-05-10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf [https://perma.cc/LR6Z-ZMUB].

52.     Each MSB is required to retain the records described below with respect to any transmittal of funds in the amount of $3,000 or more.  31 C.F.R. §§ 1010.100(ff)(5), 1010.410, 1022.210.  Such records are required to be retained by the MSB for 5 years.  31 C.F.R. § 1010.430(d).

53.     If the sender of the funds is an established customer of the MSB, the MSB must retain the following information:

- Name and address of the transmitter;

- Amount of the transmittal order;

- Execution date of the transmittal order;

- Any payment instructions received from the transmitter;

- The identity of the recipient's financial institution;

- As many of the following items as are received with the transmittal order: (i) name and address of the recipient, (ii) the account number of the recipient, and (iii) any other specific identifier of the recipient;

and

- Any form relating to the transmittal of funds that is completed or signed by the person placing the transmittal order.

31 C.F.R. § 1010.410(e)(1)(i).

54.     If the sender of the funds is not an established customer of the MSB, the MSB must retain all of the information specified in the preceding paragraph, plus:

- The type and number of the identification documents reviewed to verify the transmitter's identity, such as a driver's license, social security number or other tax identification number, or a passport or alien identification number; and

- A copy or record of the transmitter's method of payment.

31 C.F.R. § 1010.410(e)(2)

55.     If the recipient of the funds is an established customer of the MSB, the MSB must retain an original, microfilm, other copy, or electronic record of the transmittal order.  31 C.F.R. § 1010.410(e)(1)(iii).

56.     If the recipient of the funds is not an established customer of the MSB, the MSB must retain the following information:

- The same types of information described in paragraphs 53 and 54 above, but substituting "recipient" for "transmitter";

- An original, microfilm, other copy, or electronic record of the transmittal order;

- If the MSB knows that the person receiving the proceeds is not the ultimate recipient, the ultimate recipient's name, address, and taxpayer identification number, alien identification number, or passport number (along with the country of

issuance); and

- If the proceeds are delivered other than in person, a copy of the check or other instrument used to pay the transmittal, or the information contained on the check or other instrument, as well as the name and address of the person to whom it was sent.

31 C.F.R. § 1010.410(e)(3).

57.     In addition, each MSB must develop, implement, and maintain an effective anti-money laundering program.  31 C.F.R. § 1022.210(a).  At a minimum, the program must include provisions for verifying customer identification, filing reports, creating and retaining records, and responding to law enforcement requests.  31 C.F.R. § 1022.210(d)(1)(i).

58.     Additionally, Circle subsidiary SI Securities, LLC is a registered brokerage firm with the U.S. Securities and Exchange Commission and the Financial Industry Regulatory Authority. https://brokercheck.finra.org/firm/summary/170937 [https://perma.cc/BRH4-EN56].

59.     On October 18, 2019, Circle announced that Poloniex would be spinning out from Circle into a new independent international company, Polo Digital Assets, Ltd. *Poloniex to Spin Out of Circle* (Oct. 18, 2019), https://www.circle.com/blog/poloniex-to-spin-out-of-circle [https://perma.cc/K2R6-KVED]); *Poloniex Spins Out from Circle with New Backing & Global Focus*, https://support.poloniex.com/hc/en-us/articles/360040020993-Poloniex-Spins-Out-from-Circle-with-New-Backing-Global-Focus [https://perma.cc/6P2B-UPXH].  As of November 1, 2019, U.S. customers are no longer able to trade on the Poloniex exchange.  U.S. customers were required to

withdraw their assets from Poloniex no later than December 15, 2019. *Trading for US Poloniex Customers Has Ended*, https://support.poloniexus.circle.com/hc/en-us/articles/360037489272-Trading-for-US-Poloniex-Customers-Has-Ended [https://perma.cc/CK7Y-L3DV].

**B.    Circle's Products and Operations**

60.    As of early October 2019, Circle offered its financial products and services through subsidiaries, divisions, or affiliates, which Circle identified as: Poloniex, Circle Trade, USD Coin, Circle Invest, SeedInvest, and Circle Research.  *See* https://web.archive.org/web/20191022123009/https://www.circle.com/en/..

61.    To access Circle's products, users historically have had to create a single master account through which the various services can be accessed.  *See* Circle U.S. User Agreement (Updated Mar. 21, 2017), https://web.archive.org/web/20170712031709/https://www.circle.com/en/legal/us-user-agreement.  To create a master account, Circle requires certain information, including the user's full legal name.  As described in more detail below, additional information must be provided, and further eligibility requirements must be met, to access each underlying service.

62.    Poloniex is a virtual currency exchange.  Prior to October 2019, Poloniex was open to United States customers, and allowed its users to trade more than 60 types of virtual currency assets.  Users opening an account with Poloniex were required to provide their full legal name, full current address, a picture of an identification card, and a picture that includes their face and documents with the current date and the word "Poloniex" visible. https://support.poloniex.com/hc/en-us/articles/360039542734-

Verification-Tips [https://perma.cc/8FPU-36WN].  Poloniex uses an automated system to verify customer information.  *Id.*  On its webpage "Verification Tips," Poloniex included an example of what the picture should look like.  *Id.*  Poloniex also reserved the right to request additional documents, such as a current utility bill with their name and address listed on it.  *Id.*  Users funded Poloniex accounts by depositing virtual currency, wiring funds from a linked bank account, or by purchasing bitcoin with a debit card through Simplex.  *See* https://support.poloniex.com/hc/en-us/articles/360040016493-How-to-fund-your-account [https://perma.cc/B77G-L4L3].  A single bank account linked to a Poloniex account could be used for inbound and outbound wire transfers.  *See* **Exhibit 3** (copy of former Poloniex support web page).

63.    Circle Invest allows customers to invest in 14 types of virtual currencies.[8] Circle Invest is a differentiated product, offering more limited trading options than Circle Trade or Poloniex to customers who are starting to invest in virtual currency.   In order to open a Circle Invest account, users are required to provide their name, email address, phone number, date of birth, home address, and last four digits of their Social Security number. https://support.invest.circle.com/hc/en-us/articles/360000209726-Why-am-I-being-asked-information-to-verify-my-identity- [https://perma.cc/9CFZ-3PV7]. Circle explained to prospective users that "[t]hose pieces of information are instrumental to verifying your identity."  *See id.*  Circle reserves the right to request a government issued photo ID and a picture of the user to verify certain identities. *Id.*  Users of Circle Invest must link their account to a United States bank account.

---

[8] Circle divested Circle Invest in March 2020.  The number of cryptocurrencies cited in this sentence applies to the period before Circle Invest was divested.

https://support.invest.circle.com/hc/en-us/articles/360000210443-How-can-I-deposit-money-into-Circle-Invest- [https://perma.cc/66FS-55KA].

64.    USD Coin is a "stablecoin" backed by the United States dollar.  *See* https://www.circle.com/en/usdc [https://perma.cc/E5N5-N4SQ] and https://support.usdc.circle.com/hc/en-us/articles/360015439351-Know-your-customer-and-identity-verification [https://perma.cc/TPN5-XH73].  Specifically, USD Coin (USDC) enables users to tokenize fiat currency into USDC by making a wire transfer to Circle USDC's bank account and to redeem USDC into fiat currency by receiving a USD wire transfer to the user's bank account.  *See* https://support.usdc.circle.com/hc/en-us/articles/360015179712-Circle-USDC-Basics [https://perma.cc/5CQJ-LX46]. According to these pages on Circle's web site, in order to transact USDC in a Circle account, users have been required to provide their full legal name, country of birth, country of residence, date of birth, tax identification number, residential address, email address, phone number, government issued identification and a photo of the user. Users of USDC have also been required to link a bank account to their Circle account.

65.    SeedInvest is a startup investing platform that allows its customers to invest in certain pre-vetted startup and investment opportunities.  *See* https://www.seedinvest.com/faqs [https://perma.cc/9M7D-9KFR] Since SeedInvest accounts do not hold virtual currency, this subsidiary will not be discussed further in this declaration. *Id*.

66.    As of January 2021 I did a search of IRS records on whether Circle and its affiliated companies provide information returns to the IRS with respect to any transactions, including those involving virtual currency.  I have found no IRS records

that indicate Circle and its affiliated companies provided information returns to the IRS relating to virtual currency transactions conducted by, or on behalf of, their customers.

### C.    Suspected Non-Compliance by Circle Users

67.    Taxpayer 1 is a U.S. person.  For 2014, 2016 and 2017, Taxpayer 1 filed Forms 1040 with the IRS.  Taxpayer 1 failed to file a Form 1040 for tax year 2015 with the IRS.  While under IRS examination, Taxpayer 1 admitted in an interview with a Revenue Agent that he conducted transactions through an account with Poloniex during 2014, 2016 and 2017.  However, Taxpayer 1's returns for such years did not report any transactions conducted through Poloniex.  The Service issued a summons to Circle. Circle's response included information about two accounts held by Taxpayer 1 through Poloniex.  The information included Taxpayer 1's name, address, phone number, email address, login history with IP addresses, pictures, driver's license image, chat name, account status, communications with Poloniex, account balances by type of virtual currency and information on more than 700 virtual currency transactions.  None of these more than 700 virtual currency transactions were reported on any tax return filed with the IRS by Taxpayer 1.  Based on my experience as a Senior Revenue Agent, these types of transactions are indicative of taxable income.  However, Taxpayer 1 failed to file a return reporting income from this activity.

68.    Taxpayer 2 and Taxpayer 3 are married U.S. persons.  Taxpayer 2 and Taxpayer 3 hold a Working Visa and International Student Visa, respectively.  While Taxpayers 2 and 3 filed joint income tax returns for 2015 and 2016 with the IRS, such returns did not report any virtual currency transactions.  During an IRS examination, the IRS discovered entries on Taxpayers' bank statements showing transactions with

Circle.  Subsequently, the IRS issued a summons to Circle.  Circle's response to the summons included information about a Circle account and a previously unknown Poloniex account, each held by Taxpayer 3.  The information related to the Circle account included the account holder's name, date of birth, address, phone number, email address, linked checking account, login history with IP addresses, communications with Circle, account balances by type of virtual currency, and information on more than 40 transactions.  None of these more than 40 virtual currency transactions were reported on any tax return filed with the IRS by Taxpayer 3.  The information related to the previously unknown Poloniex account included the account holder's name, address, phone number, email address, login history with IP addresses, self-pictures, passport image, chat name, communications with Poloniex, account balances by type of virtual currency, and information on more than 500 transactions. None of these more than 500 virtual currency transactions were reported on any tax return filed with the IRS by Taxpayer 3.  Based on my experience as a Senior Revenue Agent, these types of transactions are indicative of taxable income.  However, Taxpayers 2 and 3 have failed to file a return reporting income from this activity.

69.     Taxpayer 4 is a U.S. person who filed Forms 1040 with the IRS for 2015-2017.  While under IRS examination, during an interview with a Revenue Agent, Taxpayer 4 stated that Taxpayer 4 had no virtual currency transactions before 2017. However, the Schedule D attached to Taxpayer 4's 2016 income tax return reported bitcoin transactions with basis of $0 and proceeds of $0.  Furthermore, the Schedule C attached to Taxpayer 4's 2017 income tax return reported expenses from virtual currency mining, but no income.  During the IRS examination of Taxpayer 4's 2017 tax

year, Taxpayer 4 stated that only losses were incurred through the virtual currency mining activity.  During the examination, the IRS issued a summons to Circle.  Circle's response to the summons included information about six previously unknown accounts related to Taxpayer 4, three accounts at Circle and three at Poloniex.  Information related to the Circle accounts included the account holder's name, date of birth, address, phone number, email address, linked debit, credit, and checking accounts, login history with IP addresses, self-picture, passport image, communications with Circle, account balances, and information on more than 170 transactions.  None of these more than 170 virtual currency transactions were reported on any tax return filed with the IRS by Taxpayer 4.  Information related to the Poloniex accounts included the account holder's name, address, phone number, email address, login history with IP addresses, chat name, account status, communications with Poloniex, and information on more than 80 transactions.  None of these more than 80 virtual currency transactions were reported on any tax return filed with the IRS by Taxpayer 4.  The summons information included transaction data from 2015 to 2017.  Based on my experience as a Senior Revenue Agent, these types of transactions are indicative of taxable income. However, Taxpayer 4 failed to file a tax return with the IRS reporting income from this activity conducted through Circle and Poloniex.

70.     Additionally, I learned that in 2018, Taxpayer 4 attempted to start a new virtual currency.  The proposed virtual currency was a health care related token, Token 1.  Documents related to Token 1 described Taxpayer 4 as a "cryptocurrency expert," "owner of a mid-size mining operation," and an "experienced business owner in the IT industry."

71.     Taxpayer 5 and Taxpayer 6 are married U.S. persons.  They did not file income tax returns for 2014 or 2015 with the IRS, so the IRS generated substitute for returns for both years based upon information return filings.  Taxpayers 5 and 6 filed an income tax return with the IRS for 2016.  During 2016, Taxpayers 5 and 6 both pleaded guilty to (i) conspiracy to distribute a controlled substance and (ii) money laundering-transportation of stolen property, for conduct occurring during 2015.  Taxpayers 5 and 6 used an account at Circle to hold, and convert into U.S. dollars, payments received in bitcoin arising from the Taxpayers' illegal activities.  During an IRS examination of Taxpayers' 2015 tax year, the IRS issued a summons to Circle.  Circle's response to the summons included information about an account held in Taxpayer 5's name.  The information included the account holder's name, date of birth, address, phone number, email address, linked checking account, IP addresses, communications with Circle, as well as account balances by type of virtual currency, and information on more than 40 transactions.  None of these more than 40 virtual currency transactions were reported on any tax return filed with the IRS by Taxpayer 5.  At the time the summons was served, Circle had closed Taxpayer 5's account due to prohibited activities.  Based on my experience as a Senior Revenue Agent, these types of transactions are indicative of taxable income.  However, Taxpayers 5 and 6 have failed to file a return reporting income from this activity.

72.     Taxpayer 7 is a U.S. person.  Taxpayer 7 filed income tax returns with the IRS for each of the 2014, 2015, 2016 and 2017 tax years. Information relating to Taxpayer 7 was present in the data that Coinbase provided to the IRS pursuant to a John Doe summons.  As a result, Taxpayer 7 received Letter 6173 as part of the Virtual

Currency Campaign.  Letter 6173 informs the recipient that the IRS has information about virtual currency accounts held by the recipient, and that the recipient may not have met the applicable filing and reporting requirements.  After issuance of Letter 6173, Taxpayer 7 filed amended tax returns with the IRS for 2014, 2015, 2016 and 2017.  The amended tax returns included previously unreported virtual currency sales of more than $1,600,000 as well as additional tax on those sales.  In his response to Letter 6173, Taxpayer 7 listed Poloniex as one of the exchanges that he used to buy and sell virtual currency.

### III.  The John Doe Summons Requirements Are Met

73.    The IRS has commenced an investigation of unknown U.S. persons (John Does) who directly or indirectly had authority over any combination of accounts held with Circle with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year for the period January 1, 2016 through December 31, 2020.

74.    To facilitate this investigation, the IRS is seeking the Court's permission to serve, pursuant to sections 7602 and 7609(f) of the Internal Revenue Code (26 U.S.C.), a John Doe summons on Circle.  A copy of this summons is attached as **Exhibit A**.

75.    As described below: (1) the John Doe summons relates to the investigation of an ascertainable group or class of persons; (2) there is a reasonable basis for believing that this group or class of persons has failed or may have failed to comply with provisions of the internal revenue laws; and (3) the information and documents sought to be obtained from the examination of the records or testimony (and the identity of the persons with respect to whose tax liabilities the summons has been

issued) are not readily available from sources other than Circle.

76.     Additionally, the information sought in the summons is narrowly tailored to seek only information that is necessary for the IRS to identify and investigate whether individuals in the John Doe class complied with the internal revenue laws with respect to their cryptocurrency activity.

77.     The summons, attached as **Exhibit A**, seeks records that may reveal the identity and cryptocurrency transaction activity of U.S. persons who were Circle users with at least the equivalent of $20,000 in value of any cryptocurrency transactions (regardless of type or account) in any one year during the period from January 1, 2016 through December 31, 2020.  The information requested is narrowly tailored to assist the Service with identifying U.S. taxpayers meeting the transaction limitations set forth above in any combination of accounts through Circle and who may have failed to comply with the internal revenue laws.  The requests in the summons are directed at two broad categories.

78.     First, requests one through four are directed at adequately identifying the John Doe class members so that transactional data can reasonably be associated with a particular person.  Unlike traditional financial accounts, Circle accounts can be opened with limited personal-identifying information.  Unlike traditional bank accounts, there are no signature cards or written account applications.  As a result, linking a particular account to an actual person for purposes of examining such taxpayer's compliance with the internal revenue laws requires access to whatever identifying information Circle obtained from the user during the opening of the account or during its subsequent usage.

79.     Second, requests five and six are directed at obtaining transactional information that may permit the Service to evaluate whether a particular, previously unknown taxpayer identified through the summons has fully complied with the internal revenue laws with respect to the treatment of cryptocurrency.

80.     The IRS expects the summoned records to produce leads that will help it to identify U.S. taxpayers that have transacted in cryptocurrency through Circle at a specified floor level at any time during the period specified in the John Doe summons, who have failed to comply with the internal revenue laws with respect to their reporting of those transactions.  The floor transactional level and specified tax period for the John Doe summons are described in paragraph 77 above.

81.     Addressing the requests specifically, summons request number 1 reflected on **Exhibit A** seeks account registration records for each account owned or controlled by a user, including the complete user profile, history of changes to the user profile, user preferences, user history (including confirmed devices and account activity), user payment methods, and any other information related to the funding sources for the account.  The IRS is not seeking any individual user's personal password, pin information, private keys, security settings, or account recovery information.

82.     The requested account registration records and user profile will be used by the IRS to verify the identity of each Circle user in the John Doe class and to assist the IRS in determining whether that user is a U.S. person.

83.     The requested history of changes to the user profile may assist the IRS in identifying whether an applicable Circle user has employed an alias, nominee, or some

other tactic to disguise his identity after the initial user account setup.  This information is relevant in determining, and verifying, the identity of Circle users who are U.S. persons.

84.     The requested user preferences and history are to help the IRS understand how the account was managed or controlled by the user and any other third parties.  This information may also be relevant in determining, and verifying, the identity and transaction activity of Circle users who are U.S. persons.

85.     The requested user's payment methods may identify for the IRS sources of funds that may have been undisclosed by the taxpayer for tax purposes.  This information may be relevant in determining, and verifying, the identity and transaction activity of applicable Circle users who are U.S. persons.

86.     Summons request number 2 reflected on **Exhibit A** seeks any records associated with Know-Your-Customer due diligence that Circle performed on its applicable users that was not produced in response to request number 1.  These records are relevant in determining, and verifying, the identity of Circle users who are U.S. persons.

87.     Summons request number 3 reflected on **Exhibit A** seeks all correspondence between Circle and its applicable users (or any third party that has access to the account) about the account.  This information may be relevant in determining, and verifying, the identity of the account user or how the account was used.  Moreover, communications pertaining to the account may be relevant to revealing other accounts controlled by the same user.

88.     Summons request number 4 reflected on **Exhibit A** seeks all exception

reports produced by Circle's anti-money laundering ("AML") system and all records related to investigations of those reported exceptions.  These records may be relevant in assisting with tax-compliance investigations by identifying beneficial owners and parties involved in virtual currency transactions conducted through aliases, pseudonyms, or nominees as well as identifying internet protocol and email addresses of U.S. persons.  The records sought do not include any suspicious activity reports ("SARs") that were ultimately generated as a consequence of an AML alert or any other information that would reveal the existence of a SAR.

89.     Summons request number 5 reflected on **Exhibit A** seeks all records relating to a user's cryptocurrency transactions in the account including the buying or selling of cryptocurrency units, the lending or margin trading of cryptocurrency units, the deposit or withdrawal of cryptocurrency units into the account, and the receipt of any units into the account by other means such as a chain-splitting fork or promotional events.  Because cryptocurrency is treated as property for federal tax purposes and a taxpayer is required to report cost basis of cryptocurrency dispositions based on either specific identification or the "first-in, first-out" method, the IRS needs the complete transaction history to verify whether cryptocurrency transactions were properly reported.

90.     Summons request number 6 reflected on **Exhibit A** seeks all records relating to a user's U.S. dollar or foreign legal tender transactions (together, fiat currency) in the account.  Funding information is necessary for the IRS to determine the source of funds for cryptocurrency purchases and whether a user properly reported all taxable income for a particular tax year.  For example, it is the IRS's experience that a taxpayer who reports minimal taxable income for a tax year while simultaneously

purchasing large amounts of property (such as virtual currency) in the same tax year may not be fully reporting their taxable income.

**A.      The Summons Describes an Ascertainable Class of Persons**

91.      The proposed John Doe summons to Circle seeks information regarding U.S. taxpayers who, directly or indirectly held or had control over any combination of user accounts at Circle with at least the equivalent of $20,000 in value of any transaction types in any one year during the period January 1, 2016 through December 31, 2020.  This class of persons is ascertainable, in that the persons in the class are particularized from the general public by their characteristics of having held or controlled a cryptocurrency account at Circle during the specified time period and in the specified floor amount.

**B.      There is a Reasonable Basis to Believe that Members of the John Doe Class May Have Failed to Comply with Internal Revenue Laws**

92.      Cryptocurrency, along with other virtual currencies, are treated as property under the internal revenue laws.  The receipt and disposition of cryptocurrency may give rise to federal tax liabilities.  As detailed in this declaration, the IRS is aware of numerous situations where owners of cryptocurrency have failed to comply with internal revenue laws as it relates to transactions conducted with cryptocurrency.

93.      The information and experience of the IRS suggests that many unknown U.S. taxpayers engage in cryptocurrency transactions or structures.  Because the IRS does not know the identity of the individuals within the John Doe class, the IRS cannot yet examine the income tax returns filed by those United States taxpayers to determine whether they have properly reported any income attributable to cryptocurrencies.

94.      In addition, during my investigation, I was able to identify specific

individuals, discussed above, who held cryptocurrency accounts with Circle and, based on my knowledge and experience, failed to comply with their tax reporting requirements under the internal revenue laws.

**C.    The Requested Materials (and the Identities of the Members of the John Doe Class) are Not Readily Available from Other Sources**

95.    To my knowledge, and based on my experience, the only repository of the information sought by the proposed summons that is readily available to the Service is Circle.  To the extent that there are U.S. taxpayers who are also Circle users and their identities are known to the IRS at the time the summons is issued, such U.S. taxpayers/Circle users will be excluded from the John Doe class.

96.    In light of the above, the records sought by the John Doe summons are not otherwise readily available to the IRS.

## IV.    Conclusion

97.    Based upon the foregoing, the information sought in the John Doe summons to be served on Circle Internet Financial Inc., will allow the IRS to identify United States persons who may have failed to comply with their obligation to report and pay U.S. tax on income realized in cryptocurrency transactions during the years ending December 31, 2016 through December 31, 2020.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 30th day of March 2021, in Farmers Branch, Texas.

_____
JOHN MARK PEIL
Senior Revenue Agent
Internal Revenue Service